USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1024

 RICHARD BRETON and CANDACE BRETON,

 Plaintiffs, Appellants,

 v.

 THE TRAVELERS INSURANCE COMPANY
 
 Defendant, Appellee,
 
 

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

 [Hon. D. Brock Hornby, U.S. District Judge] 
 
 

 Before
 
 Torruella, Chief Judge,
 Selya and Lynch, Circuit Judges.
 

 Mark L. Randall, with whom Daniel G. Lilley Law Offices, P.A.,
was on brief, for appellant.
 Barbara Werthmann for appellee. 

June 25, 1998

 LYNCH, Circuit Judge. This case presents the question of
whether Maine law permits an employee to sue his employer's
workers' compensation insurance carrier in tort, where that
insurer, in its handling of the defense of that claim, has
intentionally caused delay, including delayed payment of benefits
to the employee. The district court found that such an action is
not viable in Maine. A review of the Maine Workers' Compensation
Act and the Maine Law Court cases leads us to agree.
 I.
 In August 1997, Richard Breton filed an amended
complaint, under diversity jurisdiction, against The Travelers
Insurance Company ("Travelers"), alleging that Travelers had
intentionally and tortiously mishandled his claim for workers'
compensation benefits due him under the Maine Workers' Compensation
Act ("Act"), Me. Rev. Stat. Ann. tit. 39-A, 101 et seq. In his
complaint, Breton alleged the following course of events.
 In November 1989, while he was an employee of
Maine/Sysco, Inc., Breton was severely injured at work. Breton
promptly notified his employer of his injury. Travelers was
Maine/Sysco's workers' compensation insurance carrier during that
time. In August 1990, Travelers filed a "notice of controversy"
with the Workers' Compensation Commission, contesting Breton's
claim for workers' compensation benefits. The complaint states
that 
 [f]rom Defendant's initial involvement during
 August of 1990 until Defendant's payment of
 the final worker's compensation benefits to
 Plaintiff, Defendant individually and by and
 through its agents, servants or employers . .
 . engaged in a pattern of intentional tortuous
 [sic] conduct designed to inflict severe
 emotional distress and physical injury upon
 the Plaintiff by continuously refusing to pay
 and delaying payment of legitimate claims for
 worker's compensation benefits. 
Breton alleged that Travelers (i) repeatedly failed to write a
letter denying Breton's compensation claims, which would have
enabled Breton to be reimbursed for medical bills by his personal
health insurance carrier; (ii) intentionally obstructed Breton's
receipt of medical care and delayed the payment of medical bills;
(iii) obstructed the administration of Breton's claim, causing
delay in Breton's receipt of medical care; (iv) failed to
communicate with Breton or answer his lawyer's inquiries; and (v)
delayed the payment of medical bills which the Workers'
Compensation Commission had ordered Travelers to pay. The
complaint alleges the elements of the Maine tort of intentional
infliction of emotional distress, and requests compensatory and
punitive damages.
 Travelers, which had controverted the claim for benefits,
denied any wrongdoing in the administration of Breton's claim and
asserted, inter alia, the affirmative defense that "[t]he exclusive
remedy for the claims asserted by the Plaintiffs appears in the
Maine Workers' Compensation Act." Travelers moved to dismiss the
complaint under Fed. R. Civ. P. 12(b)(1), for lack of subject
matter jurisdiction, and 12(b)(6), for failure to state a claim. 
It argued that under the Act, an employer's workers' compensation
carrier is immune from suit in tort for actions taken in the
administration of a workers' compensation claim, and that the Act
provides the exclusive remedies for an employee injured in the
course of employment and aggrieved by the insurer's conduct. The
district court, adopting the well-reasoned recommended decision of
the magistrate judge, agreed and dismissed Breton's complaint. 
 II.
 We review de novo a decision to dismiss a complaint,
taking the alleged facts to be true and drawing all reasonable
inferences in Breton's favor. See Beddall v. State St. Bank and
Trust Co., 137 F.3d 12, 16 (1st Cir. 1998). The issue before us is
whether, assuming Breton's allegations of Travelers' wrongdoing are
true, his action is nevertheless barred by the immunity and
exclusivity provisions and administrative framework of the Act.
 The Act imposes liability, without fault, on employers
for injuries to employees that "arise out of and in the course of
employment." Me. Rev. Stat. Ann. tit. 39-A, 209. In exchange
for this no-fault liability, employers are granted immunity from
common law or statutory actions "involving personal injuries"
covered by the Act, see id. at 104, and the Act is the
employees' exclusive remedy for such injuries, see id. at 408. 
The immunity and exclusivity provisions of the Act encompass an
employer's intentional conduct. See Li v. C.N. Brown Co., 645 A.2d
606, 607-8 (Me. 1994). Under the Act, a workers' compensation
insurance carrier's immunity from civil liability is coextensive
with that of the employer, unless a contrary intent by the
legislature is apparent or such immunity is inconsistent with the
purposes of the Act. See Me. Rev. Stat. Ann. tit. 39-A, 102.
 The Act provides an administrative framework for dealing
with insurers and employers who delay payment of claims or
otherwise mishandle claims for compensation. The Act creates a
Workers' Compensation Board (formerly called the Workers'
Compensation Commission) to, inter alia, "serve the employees and
employers of the State fairly and expeditiously by ensuring
compliance with the workers' compensation laws [and] ensuring the
prompt delivery of benefits legally due." Id. at 151-A. In
order to "ensure just and efficient administration of claims," id.at 153, the Board's duties include creating an "abuse
investigation unit" to investigate "all complaints or allegations
of fraud, illegal or improper conduct or violation of this Act or
rules of the board relating to workers' compensation insurance,
benefits or programs, including those acts by employers, employees
or insurers." Id. at 153(5)(B).
 Additionally, the Act provides that if an employer or
insurance carrier fails to pay compensation as required by the Act,
it is subject to a penalty of $200 a day, of which $50 goes to the
employee:
 [I]f an employer or insurance carrier fails to
 pay compensation as provided in this section,
 the board shall assess against the employer or
 insurance carrier a forfeiture of up to $200
 for each day of noncompliance,. . . . 
 (1) The forfeiture for each day of
 noncompliance must be divided as follows: Of
 each day's forfeiture amount, the first $50 is
 paid to the employee to whom compensation is
 due and the remainder must be paid to the
 board . . . .

Id. at 324(2)(A). An insurer who is ordered to pay a forfeiture
must pay "reasonable costs and attorney's fees related to the
forfeiture" to an employee who petitions for the forfeiture. Id.at 324(2)(A)(2).
 The Act gives the Board authority to audit claims files
on an ongoing basis to determine whether insurers have met their
obligations. In addition to ordering that any delinquent
compensation be paid to deserving employees, the Board may assess
a penalty on a derelict insurer "not to exceed $10,000 upon
finding, after hearing, that an employer [or] insurer . . . has
engaged in a pattern of questionable claims-handling techniques or
repeated unreasonably contested claims." Id. at 359(2). 
Finally, the Board has "general authority" to "assess, after
hearing, a civil penalty in an amount not to exceed $1,000 for an
individual and $10,000 for a corporation, partnership or other
legal entity for any willful violation of this Act, fraud or
intentional misrepresentation." Id. at 360(2). 
 Travelers argues that the Act's immunity and exclusivity
provisions bar Breton's claims, and that the administrative
framework provides the sole remedy for an insurer's negligent or
intentional delay in payment. Travelers bolsters this position by
pointing to the historic "quid pro quo" behind the Act, and the
fact that most jurisdictions provide immunity for insurers in this
situation. In response, Breton argues that the immunity provisions
do not bar his claim because his alleged injury -- emotional
distress due to Travelers' intentional mishandling of his benefits
claim -- did not arise out of and in the course of employment. He
further argues that the Maine legislature could not have intended
the administrative framework to be a benefits claimant's sole
remedy for an insurer's intentional misconduct, because that
framework provides that the employee may receive a maximum of only
$50 per day for every day of delay. In order to give insurers
incentive to handle claims properly, Breton argues, it is necessary
to preserve common law remedies.
 Breton's arguments are far from frivolous and present
exactly the type of policy issues on which the various states have
differed in their workers' compensation systems. But an
examination of Maine case law and the policies behind workers'
compensation laws leads us to conclude that the Maine Law Court
would find Breton's claim barred by the Act.
A. Case Law
 There are two Law Court cases primarily pertinent to this
issue: Gibson v. National Ben Franklin Ins. Co., 387 A.2d 220 (Me.
1978), and Procise v. Electric Mut. Liab. Ins. Co., 494 A.2d 1375
(Me. 1985). Although an isolated reading of Gibson supports
plaintiffs' position, Procise interpreted and limited Gibson in a
manner which we believe is inconsistent with Breton's claims.
 In Gibson, the Court held that an employee's claim
against her employer's workers' compensation insurance carrier for
tortious termination of payments under a settlement agreement was
not barred, despite the Act's immunity provisions and the
administrative scheme for dealing with insurer misconduct. The
defendant insurer had argued for a dismissal on the same grounds
Travelers argues here: that the Act provides the exclusive
remedies against an employer and its insurer, and that the
administrative provisions for enforcing compensation claims were
the sole means for enforcing the insurer's obligations to
employees. The Court found both arguments unpersuasive, noting
that because the plaintiff had already established her right to
benefits in the form of an "approved compensation agreement," the
injury alleged by her -- emotional distress due to the insurer's
tortious withholding of benefits -- "was not an injury 'arising out
of the employment' within the meaning of the Act." Gibson, 387
A.2d at 222. The Court's language suggested that had plaintiff not
established with finality her right to benefits, and the claim were
still in dispute, an injury alleged as a result of the insurer's
conduct would have arisen out of the employment relationship and
therefore have had its exclusive remedy in the Act. See id.("[T]he case arises not out of appellant's original employment
relationship but out of her relationship to the carrier after her
basic remedies as an injured employee had been settled through
procedures provided by the Act.").
 The court addressed the insurer's second argument, that
there were penalty provisions in the statute for non-payment and
these should be the exclusive remedy. The Court found that
"[a]lthough [the Act] provides for sanctions against a carrier for
failure to make timely payments of compensation . . . we think it
was not intended to exclude every other remedy in a case of
intentional wrongdoing." Id. at 223. "One reason" for the Court's
non-exclusivity conclusion was "the fact that the penalties
provided for by [the Act were] payable to the State rather than the
claimant." Id.
 Several years later, the Law Court decided Procise. 
Procise had been injured, but it was not clear whether that injury
arose out of his employment. Either disability insurance or
workers' compensation covered his claim. His employer's claims
administrator characterized the injury as not work-related,
allowing him to receive prompt disability benefits, but not
workers' compensation benefits. Procise sought workers'
compensation benefits, and ultimately obtained a lump sum
settlement from the insurer, approved by the Workers' Compensation
Commission. The sums owed under that settlement were paid. 
Procise later filed suit against the claims administrator, his
employer's insurer, and several other parties for their actions
before the settlement. He alleged, inter alia, fraud, deceit, and
infliction of emotional distress. 
 The Court found that Procise's claims, all of which
"stem[med] from the handling of his injury claim as a claim for
disability unrelated to his employment rather than as a claim for
worker's compensation for a related injury," Procise, 494 A.2d at
1381, were barred by the exclusivity provisions of the Act. Id. at
1381-82. The Court emphasized that the Act provided an
administrative procedure for addressing the types of claims Procise
was making, and that Procise should have resorted to such
procedures in lieu of bringing a common law action in the courts. 
"The Workers' Compensation Act provides the exclusive procedure for
review of any administrative decision in which the basic contention
is that the plaintiff was wrongfully denied workers' compensation
benefits." Id. at 1382.
 The Court held that equating the insurer with the
employer for immunity purposes in these circumstances did not
conflict with the purposes of the Act. See Me. Rev. Stat. Ann.
tit. 39-A, 102 (defining "employer" to include the employer's
insurer "unless the contrary intent is apparent from the context or
is inconsistent with the purposes of this Act."). The Court
distinguished Gibson on the ground that it was the establishment
with finality of Gibson's entitlement to benefits which created the
distinct relationship between the plaintiff and the insurer and
permitted Gibson's claim to proceed despite the Act's exclusivity
provisions. In contrast, the Procise plaintiff's claims all arose
out of the original handling of his benefits claims.

 Breton points out that Procise arose in a very different
situation than did Gibson -- a difference, he claims, which makes
Procise irrelevant to the issues before us. It is true that the
facts in Procise were distinct from the facts in Gibson. In
Procise the employee had accepted a lump-sum settlement which had
not been overturned by the Workers' Compensation Commission, and
the employee nevertheless sought to bring a common law action
against the insurer. But the language in Procise distinguishing
Gibson was necessary to the Court's conclusion that the insurer was
immune from common law liability for actions it took prior to the
lump-sum settlement agreement. Thus, the Procise analysis is
highly relevant to this case.
 After Procise, the question is whether the employee has
alleged that the insurer's misconduct occurred after his "basic
remedies as an employee ha[d] been settled." Breton does not
allege as much. Indeed, he alleges the defendant acted tortiously
"from Defendant's initial involvement" with the processing of
Breton's claim.
 Breton argues that his claim should survive under Gibsonand Procise because he actively pursued his remedies and he was
entitled to benefits. But he does not allege a final agreement of
the sort described in Gibson and Procise which would establish an
independent relationship between the employee and the insurer
outside the employment relationship. The closest Breton comes to
making such an allegation is the claim that Travelers delayed
payment of benefits after the Workers' Compensation Board had
ordered payment. But there is no allegation that the time period
for appeal had expired, making the order a final adjudication of
benefits, and that payment was absolutely and unconditionally due. 
This is not enough to clear the substantial hurdle created by
Procise. 
 Breton also argues that the legislature cannot have
intended the Act to provide his sole remedies, because the Act
provides a maximum of only $50 per day to the injured claimant. 
See Me. Rev. Stat. Ann. tit. 39-A, 342(2)(A). On the contrary,
we think that the existence of a sum of money -- albeit a small sum
-- payable to the benefits claimant evidences the legislature's
intent to confine disputes over delayed payments and other
allegations of claims mishandling to the jurisdiction of the
workers' compensation system. See 6 Larson's Workers' Compensation
Law, 68.34(c) at 13-230 (1997) (hereinafter Larson's) ("A
majority of the courts have taken the view that [the presence of an
administrative penalty for delayed payments] evidences a
legislative intent that the remedy for delay in payments, even
vexatious delay, shall remain within the system in the form of some
kind of penalty."); cf. Gibson, 387 A.2d at 223 ("One reason for
our conclusion [that the administrative remedies are not the
plaintiff's sole remedies] is the fact that the penalties provided
by [the Act] are payable to the State rather than the claimant."). 
If the sum is not sufficient to make Breton whole for any damages
he has suffered from the insurer's delay, that is a policy matter
for the legislature. See Searway v. Rainey, 1998 WL 207782 at *1
(Me. April 29, 1998) ("Having created the statutory scheme, the
Legislature is 'better equipped to determine the impact of its
actions,' if it chooses to alter the immunity and exclusivity
provisions of the Act.") (quoting Beaulieu v. Maine Med. Ctr., 675
A.2d 110, 112 (Me. 1996)); cf. Doss v. Food Lion, Inc., 477 S.E.2d
577, 578 (Ga. 1996) ("The exclusivity provision is the bedrock of
the workers' compensation system. . . . Workers' compensation has
never been intended to make the employee whole -- it excludes
benefits for pain and suffering, for loss of consortium, and it
provides a cap on wage benefits.").
 There are valid reasons why a legislature might choose to
make its administrative remedy exclusive. Permitting common law
actions against a workers' compensation insurer where there has
been delayed payment would provide incentives to claimants to file
suit. This would measurably increase the costs of the workers'
compensation system. This, in turn, would threaten to undermine
the original intent of the law to provide definite benefits to
injured employees in exchange for predictable and limited costs to
the employers and insurers. As Professor Larson has observed,
 [i]t seems clear that a compensation claimant
 cannot transform a simple delay in payments
 into an actionable tort by merely invoking the
 magic words "fraudulent, deceitful and
 intentional" or "intentional infliction of
 emotional distress" or "outrageous" conduct
 in his complaint. The temptation to shatter
 the exclusiveness principle by reaching for
 the tort weapon whenever there is a delay in
 payments or a termination of treatment is all
 too obvious, and the awareness of this
 possibility has undoubtedly been one reason
 for the reluctance of courts to recognize this
 tort except in cases of egregious cruelty or
 venality.
6 Larson's, 68.34(c) at 13-230.
 The Law Court has on numerous occasions, in diverse
factual situations, emphasized the importance of the historical
quid pro quo, saying once:
 Generally [this Court] has looked upon this
 legislation as a transfer of the burdens
 resulting from industrial accidents,
 regardless of who may be at fault, from the
 individual to the industry and an ultimate
 distribution of such burdens upon society as a
 whole . . . . Our Court, on the other hand,
 has maintained that employers [and their
 insurers] have rights and they also are
 entitled to rely on the certainty of the
 compensation to be paid and the amount of the
 services to be rendered. Perversion of the
 law, either to benefit the employee or protect
 the employer, has the tendency only to bring
 the law into contempt. . . . The intent of
 the statute was not to burden the industries
 of the State beyond the scope of the act as
 defined by the lawmakers.

Roberts v. American Chain and Cable Co., 259 A.2d 43, 48-49 (Me.
1969) (citations omitted). See also Li, 645 A.2d at 608 (noting
that the legislature made "[t]he wording of the [exclusivity and
immunity] sections . . . broad and encompassing" in order to give
effect to the Act's underlying quid pro quo policy, and declining
to "create a judicial exception to the exclusivity and immunity
provisions for employers' intentional torts"); Beverage v.
Cumberland Farms N., Inc., 502 A.2d 486, 489 (Me. 1985) (noting
that the "legislative intendment in enacting the comprehensive
scheme for worker's compensation' was to giv[e] effect to the
underlying policy of providing certainty of remedy to the injured
employee and absolute but limited and determinate liability for the
employer") (quotation marks and citation omitted).
 In light of these interpretations, to permit Breton's
case to proceed would pervert the understood intent of the Act, and
would place greater and unintended burdens on Maine's industries
through higher workers' compensation insurance premiums.
 Maine may choose at some point to balance the scales
differently, to permit common law actions against insurers who
delay proceedings and payments, even at the cost of decreased
certainty and increased expense to the companies involved. But it
has not done so to date. 
 Our holding, as always, is confined to the facts of this
case. We stress that this case does not involve either of two
situations in which other states have permitted common law actions. 
The first is of a claimant who alleges "extreme cruelty or
venality" on the part of the insurer. See 6 Larson's, 68.34(c)
at 13-230. The second is when the insurer's conduct is so far
outside its role as a workers' compensation insurer that it ceases
to benefit from the Act's immunity. See, e.g., Unruh v. Truck Ins.
Exch., 498 P.2d 1063 (Cal. 1972) (action by employee against her
employer's workers' compensation insurer for, inter alia,
intentional infliction of emotional distress was cognizable where
insurer hired private investigator to observe and photograph
employee performing activities inconsistent with her claimed
injuries). Where, as here, the plaintiff's claim is one of
misconduct in the carrying out of the core function of a workers'
compensation insurer, we believe Maine law immunizes insurers from
common law actions and directs that such claims be resolved within
the administrative framework of the Act.
 Affirmed. Costs are awarded to Travelers.