Richard BRETON and Candace Breton,
Plaintiffs, Appellants,

v.

The TRAVELERS INSURANCE
COMPANY Defendant,
Appellee.

No. 98–1024.

United States Court of Appeals,
First Circuit.

Heard May 4, 1998.

Decided June 25, 1998.

Mark L. Randall, with whom Daniel G. Lilley Law Offices, P.A., was on brief, for appellant.

Peter B. Bickerman for appellee.

Before TORRUELLA, Chief Judge, SELYA and LYNCH, Circuit Judges.

LYNCH, Circuit Judge.

This case presents the question of whether Maine law permits an employee to sue his employer's workers' compensation insurance carrier in tort, where that insurer, in its handling of the defense of that claim, has intentionally caused delay, including delayed payment of benefits to the employee. The district court found that such an action is not viable in Maine. A review of the Maine Workers' Compensation Act and the Maine Law Court cases leads us to agree.

I.

In August 1997, Richard Breton filed an amended complaint, under diversity jurisdic-

tion, against The Travelers Insurance Company ("Travelers"), alleging that Travelers had intentionally and tortiously mishandled his claim for workers' compensation benefits due him under the Maine Workers' Compensation Act ("Act"), Me.Rev.Stat. Ann. tit. 39–A, § 101 et seq.[1] In his complaint, Breton alleged the following course of events.

In November 1989, while he was an employee of Maine/Sysco, Inc., Breton was severely injured at work. Breton promptly notified his employer of his injury. Travelers was Maine/Sysco's workers' compensation insurance carrier during that time. In August 1990, Travelers filed a "notice of controversy" with the Workers' Compensation Commission, contesting Breton's claim for workers' compensation benefits. The complaint states that

> [f]rom Defendant's initial involvement during August of 1990 until Defendant's payment of the final worker's compensation benefits to Plaintiff, Defendant individually and by and through its agents, servants or employers ... engaged in a pattern of intentional tortuous [sic] conduct designed to inflict severe emotional distress and physical injury upon the Plaintiff by continuously refusing to pay and delaying payment of legitimate claims for worker's compensation benefits.

Breton alleged that Travelers (i) repeatedly failed to write a letter denying Breton's compensation claims, which would have enabled Breton to be reimbursed for medical bills by his personal health insurance carrier; (ii) intentionally obstructed Breton's receipt of medical care and delayed the payment of medical bills; (iii) obstructed the administration of Breton's claim, causing delay in Breton's receipt of medical care; (iv) failed to communicate with Breton or answer his lawyer's inquiries; and (v) delayed the payment of medical bills which the Workers' Compensation Commission had ordered Travelers to pay. The complaint alleges the elements of

the Maine tort of intentional infliction of emotional distress, and requests compensatory and punitive damages.

Travelers, which had controverted the claim for benefits, denied any wrongdoing in the administration of Breton's claim and asserted, *inter alia*, the affirmative defense that "[t]he exclusive remedy for the claims asserted by the Plaintiffs appears in the Maine Workers' Compensation Act." Travelers moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(1), for lack of subject matter jurisdiction, and 12(b)(6), for failure to state a claim. It argued that under the Act, an employer's workers' compensation carrier is immune from suit in tort for actions taken in the administration of a workers' compensation claim, and that the Act provides the exclusive remedies for an employee injured in the course of employment and aggrieved by the insurer's conduct. The district court, adopting the well-reasoned recommended decision of the magistrate judge, agreed and dismissed Breton's complaint.

## II.

We review de novo a decision to dismiss a complaint, taking the alleged facts to be true and drawing all reasonable inferences in Breton's favor. *See Beddall v. State St. Bank and Trust Co.*, 137 F.3d 12, 16 (1st Cir.1998). The issue before us is whether, assuming Breton's allegations of Travelers' wrongdoing are true, his action is nevertheless barred by the immunity and exclusivity provisions and administrative framework of the Act.

■■■■ The Act imposes liability, without fault, on employers for injuries to employees that "arise out of and in the course of employment." Me.Rev.Stat. Ann. tit. 39–A, § 209. In exchange for this no-fault liability, employers are granted immunity from common law or statutory actions "involving personal injuries" covered by the Act, *see id.* at § 104,[2] and the Act is the employees' exclu-

---

1. Breton's wife, Candace Breton, sued for loss of consortium. Ms. Breton's claim is derivative of Mr. Breton's claim. If Mr. Breton has not made out a viable claim for relief under Maine law, then Ms. Breton's claim fails along with it. *See McKellar v. Clark Equip. Co.*, 472 A.2d 411, 414–15 (Me.1984) (Act's exclusivity and immunity

provisions apply equally to loss of consortium claims).

2. Me.Rev.Stat. Ann. tit. 39–A, § 104 provides, in relevant part:

> An employer who has secured the payment of compensation in conformity with [the Act] is

sive remedy for such injuries, *see id.* at § 408.[3] The immunity and exclusivity provisions of the Act encompass an employer's intentional conduct. *See Li v. C.N. Brown Co.,* 645 A.2d 606, 607–8 (Me.1994). Under the Act, a workers' compensation insurance carrier's immunity from civil liability is coextensive with that of the employer, unless a contrary intent by the legislature is apparent or such immunity is inconsistent with the purposes of the Act. *See* Me.Rev.Stat. Ann. tit. 39–A, § 102.

The Act provides an administrative framework for dealing with insurers and employers who delay payment of claims or otherwise mishandle claims for compensation. The Act creates a Workers' Compensation Board (formerly called the Workers' Compensation Commission) to, *inter alia*, "serve the employees and employers of the State fairly and expeditiously by ensuring compliance with the workers' compensation laws [and] ensuring the prompt delivery of benefits legally due." *Id.* at § 151–A. In order to "ensure just and efficient administration of claims," *id.* at § 153, the Board's duties include creating an "abuse investigation unit" to investigate "all complaints or allegations of fraud, illegal or improper conduct or violation of this Act or rules of the board relating to workers' compensation insurance, benefits or programs, including those acts by employers, employees or insurers." *Id.* at § 153(5)(B).

Additionally, the Act provides that if an employer or insurance carrier fails to pay compensation as required by the Act, it is subject to a penalty of $200 a day, of which $50 goes to the employee:

> [I]f an employer or insurance carrier fails to pay compensation as provided in this section, the board shall assess against the employer or insurance carrier a forfeiture of up to $200 for each day of noncompliance, . . . .

> (1) The forfeiture for each day of noncompliance must be divided as follows: Of each day's forfeiture amount, the first $50 is paid to the employee to whom compensation is due and the remainder must be paid to the board. . . .

*Id.* at § 324(2)(A). An insurer who is ordered to pay a forfeiture must pay "reasonable costs and attorney's fees related to the forfeiture" to an employee who petitions for the forfeiture. *Id.* at § 324(2)(A)(2).

The Act gives the Board authority to audit claims files on an ongoing basis to determine whether insurers have met their obligations. In addition to ordering that any delinquent compensation be paid to deserving employees, the Board may assess a penalty on a derelict insurer "not to exceed $10,000 upon finding, after hearing, that an employer [or] insurer . . . has engaged in a pattern of questionable claims-handling techniques or repeated unreasonably contested claims." *Id.* at § 359(2). Finally, the Board has "general authority" to "assess, after hearing, a civil penalty in an amount not to exceed $1,000 for an individual and $10,000 for a corporation, partnership or other legal entity for any willful violation of this Act, fraud or intentional misrepresentation." *Id.* at § 360(2).

Travelers argues that the Act's immunity and exclusivity provisions bar Breton's claims, and that the administrative framework provides the sole remedy for an insurer's negligent or intentional delay in payment. Travelers bolsters this position by pointing to the historic "quid pro quo" behind the Act, and the fact that most jurisdictions provide immunity for insurers in this situation. In response, Breton argues that the immunity provisions do not bar his claim because his alleged injury—emotional distress due to Travelers' intentional mishandling of his benefits claim—did not arise out of and in the course of employment. He

---

exempt from civil actions, either at common law or under sections 901 to 908; Title 14, sections 8101 to 8118; and Title 18–A, section 2–804, involving personal injuries sustained by an employee arising out of and in the course of employment, or for death resulting from those injuries.

**3.** Me.Rev.Stat. Ann. tit. 39–A, § 408 provides that, except for illegally employed minors, "an employee of an employer who has secured the payment of compensation as provided in [the Act] is deemed to have waived the employee's right of action at common law and under section 104 to recover damages for the injuries sustained by the employee."

further argues that the Maine legislature could not have intended the administrative framework to be a benefits claimant's sole remedy for an insurer's intentional misconduct, because that framework provides that the employee may receive a maximum of only $50 per day for every day of delay. In order to give insurers incentive to handle claims properly, Breton argues, it is necessary to preserve common law remedies.

Breton's arguments are far from frivolous and present exactly the type of policy issues on which the various states have differed in their workers' compensation systems. But an examination of Maine case law and the policies behind workers' compensation laws leads us to conclude that the Maine Law Court would find Breton's claim barred by the Act.

## A. *Case Law*

There are two Law Court cases primarily pertinent to this issue: *Gibson v. National Ben Franklin Ins. Co.*, 387 A.2d 220 (Me. 1978), and *Procise v. Electric Mut. Liab. Ins. Co.*, 494 A.2d 1375 (Me.1985). Although an isolated reading of *Gibson* supports plaintiffs' position, *Procise* interpreted and limited *Gibson* in a manner which we believe is inconsistent with Breton's claims.

In *Gibson*, the Court held that an employee's claim against her employer's workers' compensation insurance carrier for tortious termination of payments under a settlement agreement was not barred, despite the Act's immunity provisions and the administrative scheme for dealing with insurer misconduct. The defendant insurer had argued for a dismissal on the same grounds Travelers argues here: that the Act provides the exclusive remedies against an employer and its insurer, and that the administrative provisions for enforcing compensation claims were the sole means for enforcing the insurer's obligations to employees. The Court found both arguments unpersuasive, noting that because the plaintiff had already established her right to benefits in the form of an "approved compensation agreement," the injury alleged by her—emotional distress due to the insurer's tortious withholding of benefits—"was not an injury 'arising out of the employment' within

the meaning of the Act." *Gibson*, 387 A.2d at 222. The Court's language suggested that had plaintiff not established with finality her right to benefits, and the claim were still in dispute, an injury alleged as a result of the insurer's conduct would have arisen out of the employment relationship and therefore have had its exclusive remedy in the Act. *See id.* ("[T]he case arises not out of appellant's original employment relationship but out of her relationship to the carrier after her basic remedies as an injured employee had been settled through procedures provided by the Act.").

The court addressed the insurer's second argument, that there were penalty provisions in the statute for non-payment and these should be the exclusive remedy. The Court found that "[a]lthough [the Act] provides for sanctions against a carrier for failure to make timely payments of compensation ... we think it was not intended to exclude every other remedy in a case of intentional wrongdoing." *Id.* at 223. "One reason" for the Court's non-exclusivity conclusion was "the fact that the penalties provided for by [the Act were] payable to the State rather than the claimant." *Id.*

Several years later, the Law Court decided *Procise*. Procise had been injured, but it was not clear whether that injury arose out of his employment. Either disability insurance or workers' compensation covered his claim. His employer's claims administrator characterized the injury as not work-related, allowing him to receive prompt disability benefits, but not workers' compensation benefits. Procise sought workers' compensation benefits, and ultimately obtained a lump sum settlement from the insurer, approved by the Workers' Compensation Commission. The sums owed under that settlement were paid. Procise later filed suit against the claims administrator, his employer's insurer, and several other parties for their actions before the settlement. He alleged, *inter alia,* fraud, deceit, and infliction of emotional distress.

The Court found that Procise's claims, all of which "stem[med] from the handling of his injury claim as a claim for disability unrelated to his employment rather than as a claim for worker's compensation for a related inju-

ry," *Procise*, 494 A.2d at 1381, were barred by the exclusivity provisions of the Act. *Id.* at 1381–82. The Court emphasized that the Act provided an administrative procedure for addressing the types of claims Procise was making, and that Procise should have resorted to such procedures in lieu of bringing a common law action in the courts. "The Workers' Compensation Act provides the exclusive procedure for review of any administrative decision in which the basic contention is that the plaintiff was wrongfully denied workers' compensation benefits." *Id.* at 1382.

The Court held that equating the insurer with the employer for immunity purposes in these circumstances did not conflict with the purposes of the Act. *See* Me.Rev.Stat. Ann. tit. 39–A, § 102 (defining "employer" to include the employer's insurer "unless the contrary intent is apparent from the context or is inconsistent with the purposes of this Act."). The Court distinguished *Gibson* on the ground that it was the establishment with finality of Gibson's entitlement to benefits which created the distinct relationship between the plaintiff and the insurer and permitted Gibson's claim to proceed despite the Act's exclusivity provisions. In contrast, the *Procise* plaintiff's claims all arose out of the original handling of his benefits claims.[4]

Breton points out that *Procise* arose in a very different situation than did *Gibson*—a difference, he claims, which makes *Procise* irrelevant to the issues before us. It is true that the facts in *Procise* were distinct from the facts in *Gibson*. In *Procise* the employee had accepted a lump-sum settlement which had not been overturned by the Workers'

Compensation Commission, and the employee nevertheless sought to bring a common law action against the insurer. But the language in *Procise* distinguishing *Gibson* was necessary to the Court's conclusion that the insurer was immune from common law liability for actions it took prior to the lump-sum settlement agreement. Thus, the *Procise* analysis is highly relevant to this case.

After *Procise*, the question is whether the employee has alleged that the insurer's misconduct occurred after his "basic remedies as an employee ha[d] been settled." Breton does not allege as much. Indeed, he alleges the defendant acted tortiously "from Defendant's initial involvement" with the processing of Breton's claim.

■ Breton argues that his claim should survive under *Gibson* and *Procise* because he actively pursued his remedies and he was entitled to benefits. But he does not allege a final agreement of the sort described in *Gibson* and *Procise* which would establish an independent relationship between the employee and the insurer outside the employment relationship. The closest Breton comes to making such an allegation is the claim that Travelers delayed payment of benefits after the Workers' Compensation Board had ordered payment.[5] But there is no allegation that the time period for appeal had expired, making the order a final adjudication of benefits, and that payment was absolutely and unconditionally due. This is not enough to clear the substantial hurdle created by *Procise*.

---

4. The Court stated:

This case can be distinguished from other cases that have held the insurance carrier independently liable for failing to pay benefits. Those cases arose not out of the original employment relationship but rather out of the relationship between the carrier and the employee after "the basic remedies as an injured employee had been settled through procedures provided by the Act." *Gibson v. National Ben Franklin Insurance Company*, 387 A.2d 220, 222 (Me.1978). In that case this Court cited with approval the line of cases suggesting that "it is correct to treat a claimant who has acquired remedial rights under a compensation act as having a status different from that

of an employee who has not acquired such rights, with the result that the immunity from suit normally afforded the carrier by employment compensation acts is not available." *Id.* The allegations made by Procise do not involve the relationship between [the insurer] and him after his basic remedies as an employee have been settled but instead involve the handling of Procise's initial benefit claims. We, therefore, find that [the insurer] is within the definition of employer... *Procise*, 494 A.2d at 1382–83.

5. Travelers has asserted before us that there is even now no final order because Breton has been receiving payments from the third party who caused his injury.

Breton also argues that the legislature cannot have intended the Act to provide his sole remedies, because the Act provides a maximum of only $50 per day to the injured claimant. *See* Me.Rev.Stat. Ann. tit. 39–A, § 342(2)(A). On the contrary, we think that the existence of a sum of money—albeit a small sum—payable to the benefits claimant evidences the legislature's intent to confine disputes over delayed payments and other allegations of claims mishandling to the jurisdiction of the workers' compensation system. *See* 6 *Larson's Workers' Compensation Law,* § 68.34(c) at 13–230 (1997) (hereinafter *Larson's* ) ("A majority of the courts have taken the view that [the presence of an administrative penalty for delayed payments] evidences a legislative intent that the remedy for delay in payments, even vexatious delay, shall remain within the system in the form of some kind of penalty."); *cf. Gibson,* 387 A.2d at 223 ("One reason for our conclusion [that the administrative remedies are not the plaintiff's sole remedies] is the fact that the penalties provided by [the Act] are payable to the State rather than the claimant."). If the sum is not sufficient to make Breton whole for any damages he has suffered from the insurer's delay, that is a policy matter for the legislature. *See Searway v. Rainey,* 709 A.2d 735 (Me.1998) ("Having created the statutory scheme, the Legislature is 'better equipped to determine the impact of its actions,' if it chooses to alter the immunity and exclusivity provisions of the Act.") (quoting *Beaulieu v. Maine Med. Ctr.,* 675 A.2d 110, 112 (Me.1996)); *cf. Doss v. Food Lion, Inc.,* 267 Ga. 312, 477 S.E.2d 577, 578 (1996) ("The exclusivity provision is the bedrock of the workers' compensation system. . . . Workers' compensation has never been intended to make the employee whole—it excludes benefits for pain and suffering, for loss of consortium, and it provides a cap on wage benefits.").

There are valid reasons why a legislature might choose to make its administrative remedy exclusive. Permitting common law actions against a workers' compensation insurer where there has been delayed payment would provide incentives to claimants to file suit. This would measurably increase the costs of the workers' compensation system. This, in turn, would threaten to undermine the original intent of the law to provide definite benefits to injured employees in exchange for predictable and limited costs to the employers and insurers. As Professor Larson has observed,

> [i]t seems clear that a compensation claimant cannot transform a simple delay in payments into an actionable tort by merely invoking the magic words "fraudulent, deceitful and intentional" or "intentional infliction of emotional distress" or "outrageous" conduct in his complaint. The temptation to shatter the exclusiveness principle by reaching for the tort weapon whenever there is a delay in payments or a termination of treatment is all too obvious, and the awareness of this possibility has undoubtedly been one reason for the reluctance of courts to recognize this tort except in cases of egregious cruelty or venality.

6 *Larson's,* § 68.34(c) at 13–230.

The Law Court has on numerous occasions, in diverse factual situations, emphasized the importance of the historical quid pro quo, saying once:

> Generally [this Court] has looked upon this legislation as a transfer of the burdens resulting from industrial accidents, regardless of who may be at fault, from the individual to the industry and an ultimate distribution of such burdens upon society as a whole. . . . Our Court, on the other hand, has maintained that employers [and their insurers] have rights and they also are entitled to rely on the certainty of the compensation to be paid and the amount of the services to be rendered. Perversion of the law, either to benefit the employee or protect the employer, has the tendency only to bring the law into contempt. . . . The intent of the statute was not to burden the industries of the State beyond the scope of the act as defined by the lawmakers.

*Roberts v. American Chain and Cable Co.,* 259 A.2d 43, 48–49 (Me.1969) (citations omitted). *See also Li,* 645 A.2d at 608 (noting that the legislature made "[t]he wording of the [exclusivity and immunity] sections . . .

broad and encompassing" in order to give effect to the Act's underlying quid pro quo policy, and declining to "create a judicial exception to the exclusivity and immunity provisions for employers' intentional torts"); *Beverage v. Cumberland Farms Northern, Inc.*, 502 A.2d 486, 489 (Me.1985) (noting that the "legislative intendment in enacting the comprehensive scheme for worker's compensation' was to giv[e] effect to the underlying policy of providing certainty of remedy to the injured employee and absolute but limited and determinate liability for the employer") (quotation marks and citation omitted).

In light of these interpretations, to permit Breton's case to proceed would pervert the understood intent of the Act, and would place greater and unintended burdens on Maine's industries through higher workers' compensation insurance premiums.[6]

Maine may choose at some point to balance the scales differently, to permit common law actions against insurers who delay proceedings and payments, even at the cost of decreased certainty and increased expense to the companies involved. But it has not done so to date.

Our holding, as always, is confined to the facts of this case. We stress that this case does not involve either of two situations in which other states have permitted common law actions. The first is of a claimant who alleges "extreme cruelty or venality" on the part of the insurer. *See 6 Larson's*, § 68.34(c) at 13–230. The second is when the insurer's conduct is so far outside its role as a workers' compensation insurer that it

ceases to benefit from the Act's immunity. *See, e.g., Unruh v. Truck Ins. Exch.*, 7 Cal.3d 616, 102 Cal.Rptr. 815, 498 P.2d 1063 (1972) (action by employee against her employer's workers' compensation insurer for, *inter alia*, intentional infliction of emotional distress was cognizable where insurer hired private investigator to observe and photograph employee performing activities inconsistent with her claimed injuries). Where, as here, the plaintiff's claim is one of misconduct in the carrying out of the core function of a workers' compensation insurer, we believe Maine law immunizes insurers from common law actions and directs that such claims be resolved within the administrative framework of the Act.[7]

*Affirmed.* Costs are awarded to Travelers.

---

**6.** The majority of jurisdictions agree with this approach. *See, e.g. Doss*, 267 Ga. 312, 477 S.E.2d 577 (Georgia Workers' Compensation Act provides exclusive remedy if employer and/or workers' compensation insurer intentionally delays payment of medical treatment); *Liberty Mutual Ins. Co. v. Coleman*, 313 Ark. 212, 852 S.W.2d 816 (1993) (employee may not sue workers' compensation insurer for intentional tort where insurer refuses to pay medical expenses to which employee is entitled); *Alston v. St. Paul Ins. Companies*, 531 Pa. 261, 612 A.2d 421 (1992) (exclusivity provisions of Pennsylvania workers' compensation act barred employee's tort action against insurer); *Mitchell v. Scott Wetzel Services, Inc.*, 227 Cal.App.3d 1474, 278 Cal.Rptr. 474 (1991) (Workers' Compensation Appeals Board has exclusive jurisdiction over employee's claims of misrepresentation and intentional delay against self-insured employer's

claims administrator); *Cook v. Mack's Transfer & Storage*, 291 S.C. 84, 352 S.E.2d 296 (App.1986) (employee may not sue workers' compensation carrier in tort for acting in bad faith in failing to pay benefits).

**7.** The Maine Act does not expressly address the issue presented here or the two situations described above, and Maine, in the interest of its already expressed policy of desiring certainty, may wish to address the matter explicitly. Some state statutes address the use of common law or other statutory actions against an insurer in the event of intentional claims mishandling. *See, e.g.*, N.M. Stat. Ann., §§ 52–1–28.1, 52–1–6(E) (claims alleging unfair or bad faith claim-processing practices may be filed under the Workers' Compensation Act, which provides the exclusive remedy for such claims).