# United States Court of Appeals
## For the First Circuit

No. 24-1379

BETTER WAY FORD, LLC; PEGGY A. CIANCHETTE; CIANCHETTE FAMILY, LLC; ERIC L. CIANCHETTE,

Plaintiffs, Appellants,

v.

FORD MOTOR COMPANY,

Defendant, Appellee,

FORD MOTOR CREDIT COMPANY,

Defendant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

---

Before

Barron, Chief Judge,
Montecalvo and Rikelman, Circuit Judges.

---

Timothy J. Bryant, with whom Michael J. Melusky and Preti, Flaherty, Beliveau & Pachios LLP were on brief, for appellants.

Robert M. Palumbos, with whom Sara E. Smith, Duane Morris LLP, Michelle I. Schaffer, William J. Conroy, Emily J. Rogers, Kristin E. Shicora, and Campbell Conroy & O'Neil, P.C. were on brief, for appellee.

July 1, 2025

**BARRON**, **Chief Judge**.  In 2016, Tucker Cianchette, a would-be owner of a Ford dealership in Maine called Casco Bay Motors, secured a multimillion-dollar judgment in Maine Superior Court.  The defendants in that case were Tucker's father and step-mother -- Eric and Peggy Cianchette -- as well as two limited liability companies, PET, LLC ("PET") and Cianchette Family, LLC ("Cianchette Family").[1]  PET owned the dealership and had as members, besides Tucker himself, only Eric and Peggy.  Cianchette Family owned the real estate on which the dealership was located.  Tucker brought his suit after Eric and Peggy had backed out of a 2015 agreement with him that would have given him sole control of PET.

Soon after the defendants in Tucker's suit had unsuccessfully challenged the judgment against them, Eric and Peggy, along with Cianchette Family and PET's successor company -- Better Way Ford, LLC ("Better Way Ford") -- filed a suit of their own.  They did so in 2021.  It is that lawsuit that has occasioned this appeal.

The 2021 suit was initially brought in Maine Superior Court.  But it was eventually removed to the United States District Court for the District of Maine.  The suit alleges that the Ford Motor Company ("Ford") violated state and federal law in connection

---

[1] To avoid confusion, we refer to the Cianchettes by their first names.

- 3 -

with the failed 2015 negotiations between Tucker, Peggy, and Eric over their membership interests in PET and through Ford's employees giving false testimony in Tucker's 2016 suit. The District Court dismissed all the claims against Ford, and the plaintiffs in that suit now argue that we must overturn the bulk of the District Court's ruling. Because we discern no grounds for doing so, we affirm.

## I.

The 2021 suit named both Ford and its subsidiary, Ford Motor Credit Company ("FMCC") as defendants. The plaintiffs dropped FMCC as a defendant after FMCC removed the case from Maine Superior Court to the District of Maine with Ford's consent. Ford thereafter moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all the plaintiffs' claims. The District Court granted that motion.

Before we directly address the arguments advanced on appeal for overturning the District Court's ruling, it helps to review the state administrative proceedings that the appellants initiated against Ford and FMCC soon after filing their 2021 suit against them. As we will see, those proceedings provide important context for the arguments that the appellants now make to us on appeal.

- 4 -

## A.

The state administrative proceedings began in April 2021 when Eric, Peggy, and Better Way Ford filed a petition against Ford and FMCC with the Maine Motor Vehicle Franchise Board (the "Board"). The petition alleged that Ford and FMCC had violated section 1174 of the Maine Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers Act (the "Dealers Act"), 10 M.R.S. §§ 1171 to 1194-A. The petition alleged that Ford and FMCC did so during: (1) the 2015 dealings in which Tucker sought to buy out Eric and Peggy's membership interests in PET, and (2) the follow-on 2016 lawsuit in which Tucker sued Eric, Peggy, PET, and Cianchette Family in Maine Superior Court for their allegedly unlawful actions in causing the breakdown in his 2015 agreement to acquire Peggy and Eric's membership interests in PET. More specifically, the petition alleged that, in connection with the 2015 dealings with Tucker and his 2016 lawsuit arising out of the breakdown in those dealings: (1) Ford "engaged in an arbitrary, bad faith, and unconscionable course of conduct"; (2) Ford "discriminated and used unreasonable, arbitrary, and unfair performance standards"; and (3) FMCC "discriminated and engaged in an arbitrary, bad faith, and unconscionable course of conduct."

The petition set forth various factual allegations. The following allegations are relevant to this appeal.

- 5 -

PET purchased a Ford dealership in Yarmouth, Maine -- Casco Bay Motors -- in 2013 with Ford's approval. At the time, PET had three members: Peggy, Eric, and Tucker.

PET had purchased the dealership after Tucker, who was working there as a manager, approached Eric and Peggy for help with meeting the capital requirements that Ford and FMCC imposed on prospective buyers. Because Tucker could not meet these requirements on his own, he proposed that Eric and Peggy invest and personally guarantee the required capital and that he manage and operate the dealership.

Peggy and Eric eventually agreed to help Tucker, and the three of them later secured Ford's approval of PET's purchase of the dealership. As a condition of that approval, Ford required that PET sign a sales and service agreement ("SSA").[2]

In addition, Ford required that PET enter into an agreement with FMCC to secure wholesale inventory financing, which is known as "floor plan" financing in the automotive industry. FMCC in turn required that Eric personally guarantee PET's indebtedness to FMCC to obtain the financing.

_____

[2] Even though Tucker did not contribute any material amount of capital to PET to finance the purchase, Ford also asked that he receive a membership interest in PET so that he would have a personal stake in the dealership's success. As a result, Eric held a 34% membership interest, while Peggy and Tucker each held a 33% membership interest.

- 6 -

Two years later, in 2015, Peggy, Eric, and Tucker entered into an agreement to change the membership of PET (the "Membership Purchase Agreement"). Under that agreement, Tucker would purchase Eric's and Peggy's membership interests in PET and thereby become the sole member. PET would retain ownership of Casco Bay Motors.

To finance his purchase of Eric's and Peggy's membership interests, Tucker proposed that PET take out a $5 million loan from Androscoggin Savings Bank. He further proposed that his own membership interest in PET serve as collateral for the loan.

Concurrent with the Membership Purchase Agreement, Tucker also entered into an agreement to purchase the real estate on which Casco Bay Motors was located (the "Real Estate Agreement"). That real estate was owned by Cianchette Family, the limited liability company of which Eric and the First Cianchette Family Irrevocable Trust were the sole members. Cianchette Family had purchased that real estate when PET bought Casco Bay Motors in 2013.

The petition further alleged that the "closings envisioned by the Membership Purchase Agreement and the Real Estate [Agreement] were each contingent upon the other, and contained a number of contingencies outlined in a Purchase & Sale Contingency Agreement." In particular, the Membership Purchase Agreement and Real Estate Agreement were both conditioned on Tucker obtaining a complete release of Eric's personal guaranty of PET's indebtedness

to FMCC for floor plan financing (the "Release Requirement"). Prior to the scheduled closings, however, "Eric and Peggy decided not to close the deal with Tucker."

In the wake of the breakdown in the negotiations with Eric and Peggy, Tucker filed the 2016 lawsuit in Maine Superior Court against the two of them, PET, and Cianchette Family. Tucker did so based on the defendants' alleged roles in causing the breakdown in his negotiations to become the sole member of PET. He alleged breach of contract, fraudulent misrepresentation, fraud in the sale of a security, and breach of fiduciary duty. The jury returned a multimillion-dollar verdict in Tucker's favor,[3] and the defendants in that case unsuccessfully appealed.

In their petition to the Board, Eric, Peggy, and Better Way Ford alleged that during the negotiations over the 2015 transaction with Tucker, Ford and FMCC employees misrepresented to Tucker that he was permitted to pledge his then-present membership interest in PET to effectuate that transaction even though such permission was "contrary to Ford's 'Capital' requirements." They also alleged that FMCC employees misrepresented to Tucker, Peggy, and Eric that a signed version of a letter that FMCC had provided would have "released any extant liability of Eric to FMCC" and

---

[3] Because the Superior Court granted summary judgment to Peggy and Eric on the securities fraud claim, the jury's verdict did not extend to that claim.

thus satisfied the Release Requirement. They alleged, too, that Tucker would not have filed the 2016 lawsuit or "cut off all family ties" "but for" these "intentional or recklessly false statements."

The petition also included allegations as to Ford's conduct during Tucker's successful 2016 lawsuit against Eric, Peggy, PET, and Cianchette Family. It alleged that during those proceedings, Ford "improperly tipped the scales of justice in favor of Tucker" when its "manager/agent Ann McDonough testified at the trial in the 2016 Lawsuit that Ford had approved the transfer of ownership from Peggy and Eric to Tucker, and that she had known . . . that Tucker was pledging his membership interest in PET as collateral for the loan." According to the petition, these "statements were intentionally or recklessly false because Ford would not in fact have approved the transfer, as it does not permit encumbrances on ownership interests of its dealers, nor does it alter its rigidly enforced capital requirements."

**B.**

The Board conducted a multiday hearing, during which it received evidence, including testimony. As in Tucker's 2016 lawsuit in Maine Superior Court, McDonough submitted testimony in the Board proceedings. In that testimony, she provided additional information about Ford's approval process. She also testified

about her authorization from Ford to provide an affidavit and testify during Tucker's 2016 lawsuit.

In 2023, the Board issued a unanimous order denying the petition. It ruled that, based on "[t]he totality of the testimony and other evidence of the purchase, the operation, and the uncompleted sale of" the dealership, the petitioners had "not establish[ed] that [Ford] or FMCC violated the Dealer's Act."

Eric, Peggy, and Better Way Ford subsequently appealed the Board's decision to the Maine Superior Court. The parties have not provided any additional information about the status of that appeal.

## C.

After the Board issued its decision, the appellants amended their complaint in their 2021 lawsuit against Ford and FMCC, which by then had been removed to the U.S. District Court for the District of Maine. In doing so, they both dropped FMCC as a defendant and narrowed their legal claims against Ford. The amended complaint alleged that Ford violated (1) Maine's civil perjury statute, 14 M.R.S. § 870; (2) Maine's Dealers Act, 10 M.R.S. § 1174; and (3) the federal Automobile Dealers' Day in Court Act, 15 U.S.C. § 1222. It also alleged that Ford breached its contractual obligations under the 2013 SSA, resulting in damages to Better Way Ford as a party to that agreement and to Peggy and Eric as intended beneficiaries. In addition, the complaint alleged

that Ford tortiously interfered with the Membership Purchase Agreement and the Real Estate Contract.

In support of these claims, the amended complaint largely reiterated the factual allegations set forth in the petition to the Board against Ford and FMCC. It also included new factual allegations regarding McDonough's testimony before the Board in its proceedings on that petition.

The District Court granted Ford's motion to dismiss on all these claims. This appeal followed.

**II.**

"We review the grant of a motion to dismiss de novo." Roe v. Healey, 78 F.4th 11, 19 (1st Cir. 2023). In doing so, "[w]e 'accept as true the complaint's well-pleaded factual allegations' and 'draw all reasonable inferences in favor of the non-moving party.'" Cheng v. Neumann, 51 F.4th 438, 443 (1st Cir. 2022) (quoting McKee v. Cosby, 874 F.3d 54, 59 (1st Cir. 2017)). "We do not," however, "credit legal labels or conclusory statements, but rather focus on the complaint's non-conclusory, non-speculative factual allegations and ask whether they plausibly narrate a claim for relief." Id. In addition, "[w]e draw the facts from the plaintiffs' complaint, 'documents attached to or fairly incorporated into the complaint,' 'facts susceptible to judicial notice,' and 'concessions in [the] plaintiff[s'] response to the

- 11 -

motion to dismiss.'" Id. at 441 (quoting Lemelson v. Bloomberg L.P., 903 F.3d 19, 21 (1st Cir. 2018)).

The appellants challenge the dismissal of their claims for (1) civil perjury, (2) violation of the Dealers Act, (3) breach of contract, and (4) tortious interference with contract. We address each challenge in turn. For ease of exposition, we refer to the amended complaint simply as the complaint.

## III.

## A.

We first address the appellants' challenges to the District Court's dismissal of their civil perjury claims. The claims rest on the Maine statute for civil perjury. See 14 M.R.S. § 870. In Maine, "[t]he elements of a civil perjury claim are '(1) a judgment obtained against a party, (2) by the perjury of the witness, and (3) introduced at the trial by the adverse party.'" Bean v. Cummings, 939 A.2d 676, 679 (Me. 2008) (quoting Kraul v. Me. Bonding & Cas. Co., 672 A.2d 1107, 1109 (Me. 1996)).[4]

---

[4] We focus our analysis on the second element. The parties do not dispute that the first element is satisfied. Ford does argue that the third element is not satisfied because, in its view, the appellants have not alleged that Ford was an "adverse party" in the 2016 lawsuit. Ford failed to raise that argument to the District Court, however. Thus, we do not consider it. See Teamsters, Chauffeurs, Warehousemen & Helpers Union, Loc. No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992).

To prove a civil perjury claim based on the testimony of a witness under Maine law, a plaintiff must show that "the witness both lied and knew that his testimony was false." Spickler v. Greenberg, 644 A.2d 469, 471 (Me. 1994). The plaintiff also must "show[] that information demonstrating [the statement's] falsity was unavailable to him before the judgment." Bean, 939 A.2d at 681. The burden is on the plaintiff to make these showings by clear and convincing evidence. Id. at 680.

The civil perjury claims set forth in the complaint concern McDonough's testimony in Tucker's 2016 lawsuit in Maine Superior Court. The complaint alleges that McDonough's testimony in that suit was perjurious insofar as McDonough allegedly indicated: (1) "that Ford had unequivocally approved the 2015 Transaction," (2) "that nothing else was necessary to finalize or 'execute' Ford's approval of the 2015 Transaction," (3) "that the dealership stock and goodwill could be pledged as collateral," and (4) "that she was authorized by Ford to provide an affidavit and testimony on Ford's behalf." To show the falsity of McDonough's testimony as to these issues during the 2016 lawsuit, the complaint relies on McDonough's allegedly inconsistent testimony to the Board. We do not find any merit to the challenges that the appellants make to us regarding the District Court's dismissal of these claims.

- 13 -

**1.**

The appellants' broadest ground for challenging the dismissal ruling is that, although the District Court in ruling on the motion to dismiss was obliged to take as true the complaint's allegations that McDonough's testimony in the 2016 trial was false, it improperly made a contrary "factual determination[] in Ford's favor." We cannot agree that the District Court did so.

"To survive a motion to dismiss, [a] complaint must 'state a claim to relief that is plausible on its face . . . .'" Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (emphasis added) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "If [a] complaint fails to include 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory,' it should be dismissed." Id. (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)). Moreover, a district court is not required to accept a complaint's allegation as true if the "materials incorporated into the complaint refute that very assertion." Cheng, 51 F.4th at 445.

The appellants do not dispute that the existence of false testimony is a material element of a civil perjury claim. Nor could they. See Spickler, 644 A.2d at 471 (explaining that the "burden" is "on the plaintiff to show that it is 'highly probable' that the witness both lied and knew that his testimony was false"

- 14 -

(quoting Taylor v. Comm'r of Mental Health, 481 A.2d 139, 154 (Me. 1984))). The appellants also do not dispute that the materials considered by the District Court in making its assessment of the plausibility of the allegations concerning the falsity of McDonough's statements were properly before it. Nor, again, could they. See Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 32 (1st Cir. 2000).

As a result, the District Court was permitted to consider whether the materials incorporated into the appellants' complaint -- including McDonough's testimony in both the Board proceedings and the 2016 lawsuit -- "strip[ped] any veneer of plausibility from the plaintiffs' . . . assertion[s]" that McDonough's statements were false. Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 20 (1st Cir. 1998); see also id. at 17 ("[T]he court's inquiry into the viability of th[e] allegations should not be hamstrung [by] . . . the plaintiff['s] fail[ure] to append to the complaint the very document upon which . . . the allegations rest."); Am. Bd. of Internal Med. v. Salas Rushford, 114 F.4th 42, 65 (1st Cir. 2024) (explaining that while the question of whether a statement is false or misleading "'is typically for the factfinder to determine,' the plaintiff must still, of course, plausibly allege such a statement" (citation omitted) (quoting Azurity Pharms., Inc. v. Edge Pharma, LLC, 45 F.4th 486, 487 (1st Cir. 2022))). The appellants are therefore

wrong to suggest that the District Court erred by assessing the basis for the factual allegations concerning the falsity of McDonough's testimony. The District Court was merely assessing whether the materials properly before it stripped the veneer of plausibility from the complaint's allegations that certain of her statements in the 2016 trial were false.

## 2.

We turn, then, to the appellants' further contention -- insofar as they mean to advance it -- that the District Court erred in its legal conclusion that the complaint failed to plausibly allege that any of the statements by McDonough that are at issue were false. Here, too, we are not persuaded.

### a.

We start with the appellants' seeming challenge to the District Court's assessment of the complaint's allegation that McDonough "lied when she testified" during the 2016 trial that, in substance, (1) Ford "had unequivocally approved the 2015 Transaction" and (2) "nothing else was necessary to finalize or 'execute' Ford's approval." The District Court determined that the complaint failed to plausibly allege that McDonough had given false testimony by so testifying.

In seeking to contest that assessment by the District Court, the appellants point to certain statements that McDonough made during the Board proceedings. They contend that through those

statements McDonough "admitted" that "Ford had not approved the 2015 Transaction" -- thus rendering plausible their allegation that McDonough lied when she testified in the 2016 trial that the transaction was "approved." They further assert that through those statements McDonough "admitted" that Ford "never reached the end of the approval process" -- thus rendering plausible their allegation that McDonough lied when she testified in the 2016 trial that "nothing else was necessary to finalize or 'execute' Ford's approval." Finally, they contend that McDonough's "admi[ssion]" during the Board proceedings that "she had never received" a certain document that "is required by Ford in all ownership transactions" demonstrates the plausibility of their allegations that McDonough's corresponding statements during the 2016 trial were false. We cannot agree.

## i.

We begin with the appellants' contention that McDonough's "admi[ssion]" during the Board proceedings that "Ford had not approved the 2015 Transaction" renders plausible their allegation that, in the 2016 trial, McDonough "lied when she testified that Ford had unequivocally approved the 2015 Transaction." They contend that McDonough made the admission in question when she testified to the Board that a transaction is not "officially approved until we have all the documents and it goes through [a] checklist process and the contract analyst checks

- 17 -

everything in" and that a transaction is "not approved . . . until the file gets checked in and it goes through all the signatures." We are not persuaded.

The language that McDonough used in the Board proceedings was sometimes inconsistent. But, when pressed about whether the transaction was, in fact, "approved," McDonough held firm, stating that "it was approved." She then went on to explain that "there's a difference between" "being approved" and "being executed." She also did so, as the appellants themselves acknowledge, while testifying to the Board that a transaction is not "officially approved until we have all the documents and it goes through [a] checklist process and the contract analyst checks everything in" (emphasis added).

Thus, after McDonough explained during the Board proceedings that the 2015 transaction was not "officially approved," she explained that it was not because "it's not approved until it's executed, and it's not executed until the file gets checked in and it goes through all the signatures." In other words, she explained in her testimony to the Board that the transaction was "approved" although not "officially approved" because it not yet been "executed." So, we do not perceive the claimed inconsistency between the "admission" in the Board proceedings and the 2016 trial testimony.

We next address the appellants' challenge to the dismissal of their perjury claims insofar as the challenge is based on McDonough's testimony during the 2016 lawsuit that nothing else was "necessary besides the closing in order for Ford to sign th[e] [letter of understanding] and finalize the approval."[5]  The appellants appear to rest this challenge on their contention that "McDonough admitted" during the Board proceedings "that Ford never reached the end of the approval process for the 2015 Transaction." But here, again, we are not persuaded.

In arguing that McDonough "admitted" during the Board proceedings that "Ford never reached the end of the approval process," the appellants first point to a portion of McDonough's Board testimony in which McDonough was asked: "There's more to be done, fair?" and she responded, "Fair."  The context of that exchange reveals, however, that, in being asked "There's more to be done, fair?" McDonough was being asked about whether there was "more to be done" <u>after</u> approval but prior to execution.  As a result, McDonough's response -- "Fair" -- is not plausibly

---

[5] The letter of understanding was a document that a Ford employee sent to Tucker before the dealings over the 2015 transaction broke down.  It indicated that Ford had "approved a Term Agreement contingent upon [Tucker's] acceptance and execution of this [l]etter."  The letter of understanding also stated, "This [l]etter will become effective when it has been signed/executed by and on behalf of [PET] and Ford Motor Company by its Assistant Secretary."

inconsistent with the statement in question from Tucker's 2016 lawsuit, which is that nothing else was "necessary besides the closing in order for Ford to sign th[e] [letter of understanding] and finalize the approval."

The record shows that just prior to being asked the question in the Board proceedings about whether "[t]here's more to be done," McDonough explained that "there's a difference between being executed" and "being approved," and that she "can't say something's a done deal until it actually happens." The petitioners' attorney then responded, "Because there are things that need to be done between when the time the letter of understanding goes out and when it finishes, right?" McDonough confirmed that this was "[c]orrect" because "[t]he parties have to go to closing."

Thus, by stating "Fair" in response to the question she was asked during the Board proceedings, McDonough's implicit admission that "[t]here's more to be done" was plainly in reference to the period after approval but before execution -- when "the letter of understanding goes out." It follows that that admission was entirely consistent with the testimony that she gave during Tucker's 2016 lawsuit. Accordingly, we reject the appellants' argument.

We now consider the appellants' other ground for concluding that the District Court erred in ruling that the complaint failed to plausibly allege that McDonough lied when she testified that nothing else was "necessary besides the closing in order for Ford to sign th[e] [letter of understanding] and finalize the approval." The appellants here highlight McDonough's testimony to the Board that, during the 2016 lawsuit, she did not discuss certain tasks that were to be completed "before [the transaction] was finally approved" -- like, for example, "review" of the "package" by "other people at Ford."

As the District Court explained, however, the fact that there were "additional things that Ford had to do" -- namely, "sign the [letter of understanding] and finalize the approval" -- was "baked into" the question McDonough was asked during the 2016 trial that elicited McDonough's statement in that trial that is alleged to be false. The question posed to McDonough was: "Was anything else necessary besides the closing in order for Ford to sign this document and finalize the approval?" It was posed to her just after she indicated that Ford had approved the transaction and that the "approval was effective." Thus, the question itself reflects an understanding that, even though the deal was "approved," steps remained to finalize the approval.

Given this context for the question, we fail to see why the tasks that the appellants point to as still needing to be done would not be included among the "additional things that Ford had to do" to "finalize the approval." So, in context, we fail to see why McDonough's testimony regarding certain required steps "before [the transaction] was finally approved" provides a basis for disturbing the District Court's conclusion that the complaint's perjury allegation on this score was not plausible.

**iv.**

The appellants offer one additional ground for contending that the District Court erred in determining that their complaint failed to plausibly allege that McDonough lied when she testified during the 2016 trial that the 2015 transaction was approved and that nothing else was necessary besides closing to finalize the approval. The appellants here rely on McDonough having "admitted" in her testimony to the Board that an "Assertions Letter" that "outlined the specifics on how Tucker's proposed collateralization effort violated Ford policies" was "never produced in the 2015 Transaction."

During her Board testimony, however, McDonough stated both that the Assertions Letter "was not required before approving the transaction," and that the Assertions Letter was "something that needs to be obtained before it's executed." Moreover, McDonough's testimony during Tucker's 2016 lawsuit was that there

was nothing "else necessary besides the closing in order for Ford to sign this document and finalize the approval." Given her other testimony in that suit that additional review occurs after approval, we fail to see how McDonough's admission in her Board testimony that the Assertions Letter was not completed is plausibly inconsistent with her testimony in the 2016 suit that Ford would still need to "finalize the approval." As a result, we reject this ground for overturning the District Court's perjury ruling.

**b.**

The appellants also appear to take aim at the dismissal of their perjury claims based on their allegation that McDonough lied when she repeatedly testified in the 2016 trial that "the 2015 Transaction had been approved with Tucker's pledge of his membership interest to a bank." They emphasize that during the Board proceedings, McDonough "testified that 'you cannot pledge' control of a dealership as collateral to a bank." In the appellants' view, this testimony in the Board proceedings shows that McDonough's testimony in the 2016 trial that Tucker was permitted to pledge his membership interest as collateral was false. The full context of the testimony in question by McDonough to the Board, however, renders implausible the appellants' allegation regarding McDonough having testified falsely in the 2016 trial.

- 23 -

McDonough stated in the Board testimony that what "you cannot do" is "pledge control" over the franchise (emphasis added). But she also noted in that same testimony that her understanding was that Tucker was not pledging control -- he was merely pledging his membership interest. She then further testified that she therefore determined that his pledge was not an impediment to approval.

Given that McDonough distinguished in her Board testimony between pledging control and pledging a membership interest, we cannot see how her Board testimony that "you cannot pledge" control conflicts with her testimony in Tucker's 2016 suit that the "bank was going to take a pledge of [Tucker's] membership interest."

The appellants counter that Tucker had, in fact, pledged control over the franchise. They contend that "if the transaction had closed, Tucker's membership interest would have given him 100% ownership of the dealership, and thus total control of the dealership," and the bank "would have as collateral the entirety of the membership interest in the dealership and the control that went along with it."

But, even if that were true, we do not see how that bears on whether McDonough gave false testimony in the 2016 trial when she testified that the 2015 transaction was approved, notwithstanding that she testified in that trial that he pledged

his membership interest. McDonough may indeed have been mistaken that Tucker's pledge of his membership interest could be a basis for approval even though a pledge of control could not be. But the relevant question is whether her testimony in the 2016 suit was plausibly false when she testified that he was approved notwithstanding his pledge of his membership interest. We do not see how we could answer that it was. She testified in the 2016 trial and the Board proceedings that Tucker's pledge of the membership interest was distinct from his pledge of control and that he was approved after having made the former pledge. That testimony is not plausibly at odds with her testimony in the 2016 trial that "the 2015 Transaction had been approved with Tucker's pledge of his membership interest to a bank."

**c.**

The appellants' final challenge as to the dismissal of their perjury claims concerns the complaint's allegation that McDonough "lied when she testified [during the 2016 trial] that she was authorized by Ford to provide an affidavit and testimony on Ford's behalf." The challenge appears, once again, to take aim at the District Court's ruling on the ground that the ruling impermissibly rested on the District Court's assessment that their complaint failed to plausibly allege that the statement in question from McDonough's 2016 trial testimony is false.

The appellants back up this challenge by emphasizing that the complaint alleged that McDonough admitted during the Board proceedings that she had not told anyone at Ford that she was providing an affidavit or that she received a subpoena to testify at trial. They also highlight the fact that McDonough testified to the Board that, although she thought that her statement in the 2016 trial that she was authorized by Ford to give the affidavit was true "at the time," she no longer believed that it was truthful.

We may assume that the appellants plausibly alleged that these statements by McDonough during the 2016 trial were false. Even still, we agree with the District Court that the appellants failed to plausibly allege that the "information demonstrating [the statements' falsity] was unavailable to [them] before the judgment." Bean, 939 A.2d at 681.

Immediately after McDonough was asked during the 2016 trial whether she was testifying as Ford's representative and answered affirmatively, their counsel requested a sidebar. During that sidebar, the following colloquy took place:

> [Plaintiffs' counsel]: I just want to be sure I understand. She is here in her capacity as Ford --
>
> [Opposing counsel]: She is authorized by Ford to be here.
>
> THE COURT: If she is authorized by Ford to be here, that is one thing. I don't know -- I

- 26 -

don't think there is such a thing as a 30(b)(6) for trial.

[Opposing counsel]: I can ask her.

[Plaintiffs' counsel]: That is my concern. I don't want her to be speaking for Ford, at least so the jury believes she is Ford Motor Company.

THE COURT: Well, I guess the answer is she is authorized by Ford to be here. I assume that that's fair.

[Plaintiffs' counsel]: That's fair.

THE COURT: Okay.

[Plaintiffs' counsel]: That's true. But I mean I don't want her to -- I think it is problematic to be saying she is speaking for Ford.

THE COURT: Okay. Okay.

. . . .

THE COURT: Well, I think the answer is that it is what it is. If she thinks she is speaking for Ford, then they think she is. But she can certainly say she's authorized by Ford.

[Plaintiffs' counsel]: I don't have a problem with that.

It is evident from this exchange that the counsel for the appellants during that 2016 trial was aware that McDonough's statements in that trial that are at issue could be false and that the counsel had an opportunity to question McDonough about the veracity of those statements. But "[e]vidence discoverable by due diligence before the trial cannot be introduced as new evidence to

- 27 -

establish perjury." 14 M.R.S. § 870(3). So, we cannot say that the appellants have plausibly alleged that "information demonstrating [the statements'] falsity was unavailable to [them] before the judgment," such that they have plausibly alleged a civil perjury claim based on these statements. Bean, 939 A.2d at 681.

The appellants counter that the "reason . . . counsel did not disagree with the court's decision . . . is that McDonough herself had said she was authorized by Ford to testify, and . . . counsel had no reason not to believe her at the time." But the exchange described above shows that, during the 2016 trial, counsel stated that he "th[ought] it [wa]s problematic [for McDonough] to be saying she is speaking for Ford." The appellants do not explain, however, why they could not have explored these doubts through inquiring into McDonough's authorization to speak on behalf of Ford on cross examination. Thus, we decline, based on this ground of challenge, to disturb the District Court's dismissal of their perjury claims.

**B.**

The appellants next challenge the District Court's dismissal of their claims under the Dealers Act. The District Court dismissed those claims under the doctrine of res judicata.

In Maine,[6] res judicata "prevents parties from relitigating claims 'if[ ] (1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been, litigated in the first action.'" 20 Thames St. LLC v. Ocean State Job Lot of Maine 2017 LLC, 252 A.3d 516, 521-22 (Me. 2021) (alteration in original) (quoting Wilmington Tr. Co. v. Sullivan-Thorne, 81 A.3d 371, 374-75 (Me. 2013)).

The appellants argue that the Board's ruling as to their Dealers Act claims may not be given res judicata effect for either of two reasons. The first is that a provision of the Dealers Act states that an "order . . . rendered against a person" under the Dealers Act "is regarded as prima facie evidence against the person." 10 M.R.S. § 1173. The second is that there are differences in the availability of evidence in Board proceedings compared to federal court.

**1.**

As to the first reason for not giving the Board ruling res judicata effect, the appellants contend that the text from

---

[6] "Under the full faith and credit statute, 28 U.S.C. § 1738, a state court judgment is entitled to the same preclusive effect in federal court as it would be given in the state in which it was rendered." García-Monagas v. De Arellano, 674 F.3d 45, 50 (1st Cir. 2012). We thus look to Maine law to determine whether the Board proceedings must be given preclusive effect.

section 1173 quoted above permits a Board order to be regarded "at most" as "prima facie evidence" in a later suit.  They thus contend that the statutory language in question precluded the District Court from giving the Board order in this case res judicata effect, as the order then would be "regarded as" a preclusive judgment rather than merely "prima facie evidence."[7]  We cannot agree.

### a.

Section 1173 states:

> Any franchisee or motor vehicle dealer who suffers financial loss of money or property, real or personal, or who has been otherwise adversely affected as a result of the use or employment by a franchisor of an unfair method of competition or an unfair or deceptive act or any practice declared unlawful by this chapter may bring an action for damages and equitable relief, including injunctive relief.

10 M.R.S. § 1173.[8]  It additionally provides that:

> A final judgment, order or decree rendered against a person in any civil, criminal or administrative proceeding under the United States antitrust laws, under the Federal Trade Commission Act, under the Maine Revised Statutes or under this chapter is regarded as

---

[7] The appellants incorrectly assert that the District Court applied collateral estoppel.  But, because they argue that section 1173 prevents a Board order from "serv[ing] as the basis for dismissing [their] Section 1174 claim," we understand them to be challenging the preclusive effect of Board proceedings more generally.  In their reply brief, the appellants confirmed this reading.

[8] Technically, this language comes from subsection one of section 1173.  But because that subsection is the only subsection of section 1173, we refer to it simply as section 1173.

> prima facie evidence against the person subject to the conditions set forth in the United States antitrust laws, 15 United States Code, Section 16.

Id.

"As the [Maine] courts have not yet addressed" whether section 1173 precludes the application of res judicata, "we must predict" how the Maine Law Court would interpret the statute. In re Garran, 338 F.3d 1, 6 (1st Cir. 2003). In Maine, "[t]he first step in statutory interpretation requires an examination of the plain meaning of the statutory language in the context of the whole statutory scheme." State v. Santerre, 301 A.3d 1244, 1247 (Me. 2023) (quoting Sunshine v. Brett, 106 A.3d 1123, 1128 (Me. 2014)). "If the statutory language is silent or ambiguous, we then consider other indicia of legislative intent." Id. (quoting Dyer v. Dyer, 5 A.3d 1049, 1051 (Me. 2010)).

Maine courts also "construe the language to avoid absurd, illogical, or inconsistent results." Id. (quoting Sunshine, 106 A.3d at 1128). Additionally, where, as here, there is a question regarding the effect of a statute on the common law, Maine courts tread lightly: they "will not interpret a statute as modifying the common law in the absence of clear and explicit language showing such modification or abrogation was intended." Rubin v. Josephson, 478 A.2d 665, 671 (Me. 1984); see also Reed v. Sec'y of State, 232 A.3d 202, 210 (Me. 2020) ("[W]e construe a

statute to alter the common law only to the extent the Legislature makes clear its intent to do so." (quoting <u>Watts</u> v. <u>Watts</u>, 818 A.2d 1031, 1034 (Me. 2003))).

**b.**

The appellants argue that because the Board "rendered" an "order" in an "administrative proceeding" "against" them, the order may in this case <u>only</u> be "regarded as" "prima facie evidence against" them.[9] Ford reads the statute differently. It contends that "[n]othing in the text of Section 1173 abrogates well-established principles of preclusion," and that, under those principles, the Board's orders are entitled to res judicata effect. In its view, therefore, section 1173, through its "is regarded as prima facie evidence" proviso, "merely ensures that the Board's findings at least have evidentiary value even if the elements of preclusion are not satisfied."

Based on the statute's text and structure, we conclude that the Maine Law Court would opt for Ford's reading. We do not

---

[9] The appellants also assert that a contrary reading of the statute would infringe on their jury trial rights under the Maine Constitution. But the District Court held that they waived that argument for lack of development. And although the appellants contest that ruling, we discern no error: they dedicated just two cursory sentences of their briefing below to that contention and failed to cite any authority beyond the relevant provision of the Maine Constitution. Thus, we do not consider that argument on appeal. <u>See</u> <u>Higgins</u> v. <u>New Balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed, and such arguments cannot be resurrected on appeal." (citation omitted)).

understand section 1173, by allowing certain plaintiffs to use a "final judgment, order or decree rendered against a person" as "prima facie evidence against" the same person, to preclude the application of res judicata. We instead read section 1173 merely to make it easier for plaintiffs to use a prior "final judgment, order or decree" in a subsequent case than it would be if such a judgment, order, or decree could be used only for its preclusive effect.

The appellants appear to accept that the "order" issued by the Board here constitutes a "final judgment" within the meaning of section 1173. That is significant, because section 1173's use of the phrase "final judgment" to describe the scope of its application supports our reading of the import of the "prima facie evidence" language in that provision.

We do not doubt that a Maine statute could describe an administrative ruling both as a "final judgment" and provide that it has no res judicata effect. But we see no reason to assume that Maine statutes generally mean to refer to administrative rulings that have no such effect as "final judgments."

Indeed, the existence of a "valid final judgment" is itself a key requirement for the application of res judicata under Maine law. 20 Thames St. LLC, 252 A.3d at 521-22 (quoting Wilmington Tr. Co., 81 A.3d at 374-75). We also are not aware of any other Maine statute that describes an administrative ruling as

a "final judgment" but has been construed not to give that ruling res judicata effect. In fact, the two statutes that the appellants point us to as being analogous do not refer to the administrative determinations in those contexts as being "final judgments." See 5 M.R.S. §§ 4612, 4622 (governing Maine's Human Rights Commission); 24 M.R.S. §§ 2854-55, 2857, 2858 (governing Maine's Medical Malpractice Panel).

Thus, the question is whether, by providing that a ruling of the Board that is a "final judgment" also "is regarded as prima facie evidence against the person subject to the conditions set forth in the United States antitrust laws," section 1173 makes that ruling of the Board the rare "final judgment" under Maine law that has no such res judicata effect. The phrase "is regarded as" is not clear enough to require a conclusion that would take section 1173 to be using "final judgment" in such an unconventional way.

To be sure, the "is regarded as" phrase presents us with the question of what the meaning of "is" is. Does it mean "is regarded only as"? Or does it mean "is regarded also as"? In context, we see no reason to construe "is" in the more restrictive manner. That reading would render the use of the term "final judgment" ill-suited to its task of describing the administrative ruling, precisely because it then would be giving that ruling a label that misleadingly implies that it has res judicata effect.

The less restrictive reading, by contrast, would render the use of the "final judgment" label well-suited to the task of describing the ruling indeed, as that label would then accurately convey that the ruling does have res judicata effect. The word "is" is not clear enough to support a reading of "final judgment" that would make that phrase such a poor descriptor.

It is also of significance that section 1173's prima facie evidence language applies to a wide array of "final judgment[s], order[s, and] decree[s]." If we accepted the appellants' view, therefore, judgments in "any civil, criminal or administrative proceeding under the United States antitrust laws, under the Federal Trade Commission Act, under the Maine Revised Statutes or under" the Dealers Act would be robbed of their preclusive effect.

In fact, under the appellants' construction of section 1173, no final judgment, order, or decree under the Dealers Act would ever be truly final. The appellants here, for example, could lose their Dealers Act claims in federal court, and then bring the exact same claims immediately thereafter. 10 M.R.S. § 1173 (noting that a "final judgment" in a "civil . . . proceedings under . . . this chapter" is considered "prima facie evidence"). So, too, could the defendants in this case. We are reluctant to read the "is regarded as" language as meeting the high bar that Maine law requires for a statute to

displace the common law when such a reading would have such a sweeping consequence.  See Reed, 232 A.3d at 210.

**2.**

The appellants also contend that the Board proceedings should not be given preclusive effect because, under Maine and First Circuit precedent, "collateral estoppel should not preclude a claim where a party 'may benefit from substantial differences in the availability or admissibility of evidence'" (quoting In re Ranbaxy Generic Drug Appl. Antitrust Litig., 573 F. Supp. 3d 459, 476-77 (D. Mass. 2021)).  In dismissing their claims, however, the District Court did not rely on collateral estoppel -- it relied on res judicata.  The appellants also fail to cite any authority that suggests that the evidentiary differences that they identify would bar the application of res judicata in this case.  So, we see no reason, based on this ground of challenge, to disturb the District Court's ruling.[10]

_____

[10] In their reply, the appellants do offer another argument against the application of res judicata.  They contend that res judicata should not apply because the evidentiary standards applied in the Board proceedings deprived them of their due process rights under the U.S. Constitution.  U.S. Const. amend. XIV.  Because the appellants failed to raise this argument below or in their opening brief, we decline to consider it.  Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) (failure to raise in opening brief); Superline Transp. Co., 953 F.2d at 21 (failure to raise in district court).

## C.

The appellants next challenge the District Court's dismissal of their breach of contract claims. They premise these claims on section 24(a) of the SSA. As we explained earlier, the SSA is the 2013 agreement to which Better Way Ford was a party and Peggy and Eric were allegedly third-party beneficiaries and that PET signed with Ford in purchasing Casco Bay Motors.

Section 24(a) of the SSA is entitled "Company Right to Approve Changes in Ownership." It provides, in part, that:

> (1) In view of the nature, purposes and objectives of the Company's Dealer Sales and Service Agreements, and the differences in operating requirements among dealerships of differing sizes and types of markets, the Company expressly reserves the right to select the dealers with whom it will enter into such agreements so as to maintain as high quality a dealer organization as possible.
> (2) . . . [T]he Dealer acknowledges that the Company has the right to approve or decline to approve any prospective purchaser as to his character, automotive experience, management, capital and other qualifications for appointment as an authorized dealer in COMPANY PRODUCTS for the DEALERSHIP OPERATIONS involved. Approval by the Company of the prospective purchaser shall not, however, be unreasonably withheld.

The complaint alleged that Ford breached its obligations under this provision by "leading Tucker to believe that it would not enforce the standards contained in the 2013 [SSA] in connection with Tucker's attempt to purchase Peggy and Eric's ownership

- 37 -

interests in Casco Bay Ford."  It alleged that, under Michigan law,[11] this conduct constituted a violation of Ford's implied duty of good faith and fair dealing.

The District Court dismissed these claims because it concluded that, under Michigan law, the "the implied duty of good faith and fair dealing has no role to play" in this case.  It noted that "[c]ourts applying Michigan law have time and again held that the implied covenant cannot be used to override the express terms of a contract, including when a contract unambiguously grants one party sole approval authority over specified changes to the relationship."  Because the SSA "expressly provided Ford the right to approve changes in ownership," the District Court likened its approval term to those cases.  See, e.g., Hubbard Chevrolet Co. v. Gen. Motors Corp., 873 F.2d 873, 877 (5th Cir. 1989); Stephenson v. Allstate Ins. Co., 328 F.3d 822, 826-28 (6th Cir. 2003).  In sum, because the 2013 SSA "did not omit terms, provide ambiguous terms, or defer decision on a particular term," Lancia Jeep Hellas S.A. v. Chrysler Grp. Int'l LLC, No. 329481, 2016 WL 1178303, at *10 (Mich. Ct. App. Mar. 24, 2016), the District Court reasoned that the implied covenant of good faith and fair dealing did not apply.

---

[11] The District Court applied Maine choice of law rules and determined that Michigan law governs the breach of contract claims. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Neither party challenges that ruling on appeal.

The appellants contend that the District Court erred because, contrary to the District Court's ruling, "no terms governing approval appear in the SSA." They argue that, in the absence of any such terms, "the SSA is ambiguous." As they see things, "it is not clear whether the parties intended for Ford to have exclusive and unconditional discretion to grant its approval, for Ford to do so only reasonably, or to determine the specifics at a later date." As a result, they contend that the implied covenant of good faith and fair dealing applies.

The SSA does include terms that govern approval, however. It provides that Ford "expressly reserves the right to select the dealers with whom it will enter into [sales and service] agreements so as to maintain as high quality a dealer organization as possible." It also states that Ford "has the right to approve or decline to approve any prospective purchaser as to his character, automative experience, management, capital and other qualifications for appointment as an authorized dealer in COMPANY PRODUCTS for the DEALERSHIP OPERATIONS involved." These terms plainly set forth Ford's authority to grant approval requests.

Thus, we cannot agree that the SSA contains "no terms governing approval." And because the appellants' charge that the SSA is "ambiguous" rests solely on this same contention, we also see no reason to disturb the District Court's ruling on that basis.

**D.**

The appellants' final challenge is to the dismissal of their tortious interference with contract claims. The complaint alleges two such claims: one on behalf of Eric and Peggy alleging interference with the Membership Purchase Agreement, and another on behalf of Cianchette Family, alleging interference with the Real Estate Contract. Both claims are premised on the theory that Ford interfered with the contracts when it "misrepresented its franchise standards in connection with Tucker's attempt to purchase Peggy and Eric's ownership interest in the Casco Bay Ford dealership" and acted in bad faith with respect to that transaction. Below, the appellants identified three such misrepresentations: (1) "that Tucker met Ford's capital requirement," (2) that "Tucker was permitted to pledge the stock and goodwill of the dealership to his bank," and (3) that "Eric would be off the hook for the dealership's liabilities."

Under Maine law, "[a] party can recover damages for a tortious interference with a contract if a person by fraud or intimidation procures the breach of a contract that would have continued but for such wrongful interference." Grover v. Minette-Mills, Inc., 638 A.2d 712, 716 (Me. 1994). In general, tortious interference with contract requires proof of three elements: "(1) the existence of a valid contract," "(2) interference with that contract," and "(3) damages

proximately caused by the interference." <u>Meridian Med. Sys., LLC</u> v. <u>Epix Therapeutics, Inc.</u>, 250 A.3d 122, 134 (Me. 2021). To prove that a defendant "procured the breach through fraud," the plaintiff must also prove that the defendant:

> (1) ma[de] a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably relie[d] on the representation as true and act[ed] upon it to the damage of the plaintiff.

<u>Grover</u>, 638 A.2d at 716.

**1.**

We begin with the claim that Ford tortiously interfered with the contracts when it "intentionally or recklessly misrepresent[ed]" (1) "that Tucker met Ford's capital requirement," and (2) that "Tucker was permitted to pledge the stock and goodwill of the dealership to his bank." The District Court rejected this claim because it concluded that the complaint had not plausibly alleged that Ford had made any representations that were false. <u>See</u> <u>Grover</u>, 638 A.2d at 716 (requiring a "false representation"). It noted that the complaint's theory of falsity rests on the same allegations as their perjury claims: that "McDonough lied when she testified that Tucker met the capital requirements and . . . that the amendment was approved." Based on its prior determination that these allegations do not support a

- 41 -

claim of perjury -- and its "review of documents properly in the record" -- the District Court concluded that the complaint had not plausibly alleged that Ford had made any misrepresentations as to these issues.

In challenging this aspect of the District Court's ruling, the appellants solely take issue with the District Court's reliance on the perjury ruling. Because they disagree with the District Court's perjury analysis, they contend that it was error for the District Court to dismiss their tortious interference claims on that basis. As we have explained, however, we discern no error with the District Court's perjury ruling. So, this ground for challenge provides us with no reason to reverse the District Court's ruling on the tortious interference claims.

**2.**

The appellants separately contend that the District Court erred when it ruled that Ford's representations regarding the Release Requirement did not support a tortious interference claim. The complaint alleged that an FMCC employee, Vince Talia, "tendered" the Guaranty Termination to Peggy, and that a Ford employee, Angela Story, "represented to Tucker [and Peggy] that [it] was sufficient to meet the Release Requirement." The complaint further alleged that even though "the Guaranty Termination, by its plain terms, would not have released any extant liability of Eric to FMCC," "Ford, through FMCC, gave Tucker the

unmistakable impression that the Release Requirement would be met and that FMCC was not an impediment to the planned closing."

The District Court concluded that these allegations do not support a tortious interference claim because the complaint did not plausibly allege that Tucker or Peggy had justifiably relied on Ford's representations. See Rutland v. Mullen, 798 A.2d 1104, 1111 (Me. 2002) (requiring the recipient of a false representation to "justifiably rel[y] on the representation as true" (quoting Petit v. Key Bank of Me., 688 A.2d 427, 430 (Me. 1996))). The District Court relied primarily on the complaint's allegation that "the Guaranty Termination, by its plain terms, would not have released any extant liability of Eric to FMCC." Because "any misrepresentation would have been uncovered by reading the relevant documents," the District Court reasoned, the complaint had not alleged that any reliance by Tucker or Peggy on contrary statements was justified. It also explained that the appellants "[s]imilarly" could not show that they had relied on any of the allegedly false representations, because the complaint alleges that they had discovered that the Guaranty Termination was insufficient and consequently backed out of the deal.

In urging reversal, the appellants contend that the District Court's reliance on their discovery of Ford's alleged deceit was misplaced. They argue that the District Court "ignored that tortious interference by fraud does not require the plaintiff

to rely upon the fraudulent statements, but rather requires <u>the person</u> to whom the misrepresentation is made to justifiably rely upon on it."  Because they also alleged that "<u>Tucker</u> relied upon Story's representation" as true, they contend that their own discovery that Story's representation was false is "irrelevant."

Implicit in this argument is the contention that the District Court failed to consider whether Tucker justifiably relied on Ford's representations.  That contention, however, clearly conflicts with the District Court's analysis.

Indeed, in rejecting the claim, the District Court relied on the proposition that "[t]he recipient of a fraudulent misrepresentation is 'required to use his senses and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation'" (quoting Restatement (Second) of Torts § 541, cmt. a (A.L.I. 1977)).  The District Court also identified Tucker as one such "recipient," explaining that the complaint "alleges that Story told Tucker that the Guaranty Termination was sufficient to meet Eric's release requirement."

In context, then, the District Court's observation that "any misrepresentation would have been uncovered by reading the relevant documents" clearly applied to Tucker.  That the District Court also noted that the appellants were "[s]imilarly" unable to show that they relied on any misrepresentations does not conflict

with that understanding.  So, we cannot agree that the District Court failed to consider the reasonableness of Tucker's reliance.

In raising this challenge, the appellants also do contend, in a rather conclusory manner, that "Tucker justifiably relied upon [Story's] representation as true."  But they do not contend that the District Court erred in observing that a "recipient of a fraudulent misrepresentation . . . 'cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation'" (quoting Restatement (Second) of Torts § 541, cmt. a (A.L.I. 1977)); cf. Francis v. Stinson, 760 A.2d 209, 217-18 (Me. 2000) (holding that when a contract makes the "falsity of any representations . . . obvious[,] . . . . any reliance on those representations is not reasonable").  Nor do they advance any argument as to why the District Court was wrong to conclude that the "falsity" of Ford's representations would be "patent to [Tucker] if he had utilized his opportunity to make a cursory examination or investigation" -- or factual allegations that would support such an argument.  They merely assert, in a "perfunctory" manner, that Tucker's reliance was justified.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  Without "some effort at developed argumentation," we consider this argument waived.

Id. As a result, we see no reason to disturb the District Court's dismissal of the tortious interference with contract claims.

### E.

For the foregoing reasons, we conclude that the appellants have failed to state claims under: (1) Maine's civil perjury statute, 14 M.R.S. § 870; (2) the Dealers Act, 10 M.R.S. § 1174; (3) Michigan common law for breach of contract; and (4) Maine common law for tortious interference with contract.

### IV.

The judgment of the District Court is therefore **affirmed**.